IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 14-840 RB |
| | ) | |
| ANTONIO BELTRAN-VIVANCO, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER GRANTING MOTION TO SUPPRESS**

**THIS MATTER** is before the Court on Defendant Beltran-Vivanco's Motion to
Suppress Evidence, filed on May 9, 2014. (Doc. 43). Having carefully considered the
submissions of counsel and the evidence adduced at the July 1, 2014 hearing, and being
otherwise fully advised, the Court **GRANTS** Defendant's motion.

**FINDINGS OF FACT**

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved
in deciding a motion, the Court must state its essential findings on the record. The Court makes
the following factual findings based on the evidence adduced at the evidentiary hearing,
including the testimony of Officer Thaxter Richard and Walter Martinez.

**THE STOP**

1. Thaxter Richard is a police officer with the New Mexico Motor Transportation,
   Department of Public Safety. He has been commissioned as an officer with the
   department since 2000. (Doc. 58 at 5:13-16). He obtained his certification after training
   at the Santa Fe Police Academy in 2000 and has received training since that time,

including training in enforcing New Mexico's traffic code and drug interdiction.  (*Id.* at 5:21-6:6).

2. On December 9, 2013, at approximately 12:00 p.m., Officer Richard was patrolling eastbound Interstate 10 near mile marker 31 in Hidalgo County, New Mexico. (*Id.* at 48:13-49:4). He noticed a white 2004 Cadillac with a New Mexico license plate in the left hand lane travelling eastbound below the speed limit and not passing other vehicles. (*Id.* at 49:11-24). The Cadillac eventually moved into the right hand lane, and Officer Richard kept pace with it while he ran a license plate check through his mobile dispatch unit.  (*Id.* at 6:15-24).

3. The Department of Public Safety (DPS) provides Officer Richard mobile access to the Motor Vehicle Division's (MVD's) motor vehicle registration information database ("Registration Database"). (*Id.* at 26:14-24; 27:11-16). Officer Richard does not have access to any other databases.  (*Id.*).

4. Officer Richard has relied on the Registration Database in the past to conduct traffic stops. The database has not always proven accurate. The Registration Database has shown that a vehicle has insurance when it was not in fact insured and vice versa. (*Id.* at 12:2-16). Officer Richard could not testify as to how often the Registration Database is accurate, but believes it to be accurate "most of the time."  (*Id.* at 12:2-20 and 46:6-13). No one had ever indicated to Officer Richard that the database was not reliable.  (*Id.* at 12:21-25; 13:1).

5. The Registration Database showed that the Cadillac was previously insured through the Hartford Casualty Insurance Company. According to the Registration Database, this

insurance expired on July 1, 2013.  (*Id.* at 10:13-17; Gov. Ex. 1). No current insurance was on file. The vehicle was registered to Jerry and Bertha Pingleton.  (*Id.* at 10:5-10).

6. Solely based on the information pulled from the Registration Database, Officer Richard initiated a traffic stop. He approached the Cadillac on the passenger side, and introduced himself to the occupants. (*Id.* at 13:5-25; 32:1-6).  The driver was later identified as Defendant Antonio Beltran-Vivanco. The passenger was later identified as Defendant Uriel Clemente. (*Id.* at 13:1-21).

7. When told the reason for the stop, Defendant Clemente stated that the Cadillac belonged to his girlfriend and that it was insured. (*Id.* at 15:1-10). Defendant Clemente produced the registration (Def. Ex. E) and an insurance card from GEICO that listed the insured as Jerry and Bertha Pingleton. (*Id.* at 17:1-13, Gov. Ex. 2). The insurance card stated the insurance was effective from October 26, 2013 to April 26, 2014.  (*Id.* at 16:14-22).

8. Officer Richard observed that Defendant Clemente "wanted to do all the talking," as if to distract Officer Richard from his task.  (*Id.* at 43:9-16).

9. During this conversation, Officer Richard learned that the defendants made the five hour drive from Deming, New Mexico, to Phoenix, Arizona, the night before. (*Id.* 43:13-45:13-11). The defendants were nearly back in Deming when he stopped them. (*Id.*).

10. While Officer Richard spoke with Defendant Clemente, Officer Richard noticed that Defendant Beltran was avoiding eye contact with him and looking straight ahead.  (*Id.* at 18:13-25; 19:1-6). This struck Officer Richards as odd because usually the driver is the first person during a traffic stop to inquire about the stop and "they always make eye contact."  (*Id.* at 19:7-15).

11. Officer Richard needed to verify the information because in his experience a person can

3

possess a validly issued insurance card but not actually have insurance on the vehicle. (*Id.* at 17:19-18:7). This happens when a person obtains a six-month insurance policy and an insurance card for that policy but stops payment on the policy before the policy expires. (*Id.*)

12. In addition, Officer Richard needed to make sure that the insurance card provided by Defendant Clemente matched the Cadillac's vehicle identification number and the information in the database. (*Id.* at 33:4-6 and 42:23-43:8). Officer Richard was concerned because neither occupant of the vehicle was a registered owner of the Cadillac and neither man appeared on the insurance. (*Id.* at 42:13-22). Further, the insurance company shown in the database did not match the insurance company listed on the insurance card provided by Defendant Clemente. (*Id.* at 22:7-24 and 42:13-22).

13. While Officer Richard approached his vehicle to verify information with his mobile dispatch computer, New Mexico Department of Public Safety Officer Alvarez[1] arrived on scene. (*Id.* at 21:10-14). Officer Richard briefed Officer Alvarez on the situation at his patrol car. (*Id.* at 21:15-25).

14. At that time, Officer Alvarez asked Officer Richard if he had checked Defendant Beltran's license. (*Id.* 21:19-22:3). When Officer Richard stated that he had not, both officers returned to the Cadillac, and Officer Alvarez asked Defendant Beltran for his license. (*Id.* at 22:2-5, 10-11 and 23:1-9). Defendant Beltran stated that he did not have a license with him, just an identification card. (*Id.* at 23:9-11, 24-25 and 24:1-2).

15. As a result of the traffic stop, the officers later found methamphetamine in the Cadillac.

---

[1] Officer Alvarez's first name was not mentioned at the evidentiary hearing.

[2] The Court concludes that the only basis for reasonable suspicion was the information Officer Richard gained through his use of the Registration Database. The Government does not contend, nor does the Court believe, that driving below the speed limit in the passing lane is a basis for reasonable suspicion.

[3] Mr. Martinez testified that a vehicle's registration is generally suspended 95 days after the FRS Database is notified that the vehicle lacks insurance.

(*Id.* at 24:9-11).

## THE DATABASE

16. Walter Martinez is the bureau chief for the Financial Responsibility Section (FRS) of the New Mexico Taxation and Revenue Department of the Motor Vehicle Division (MVD). He oversees the program operation of an Insurance Identification Database ("FRS Database") that is maintained by PASCO, a contractor. He has held this position for over nine years. (Doc. 58 at 57:5-11).

17. The FRS is responsible for ensuring that all currently registered vehicles in New Mexico are covered by liability insurance in compliance with the Mandatory Financial Responsibility Act. (*Id.* at 58:9-14; N.M.S.A. § 66-5-201 et seq.).

18. Under the Financial Responsibility Act, vehicles are required to have proof of financial responsibility. An insurance policy is the main means of providing such proof. The law requires proof of financial responsibility for a vehicle to be registered. (Doc. 58. at 64:1-65:24).

19. To ensure that all vehicles are currently insured, the FRS utilizes a web-based database. Various governmental agencies, including municipalities and the courts, can check a vehicle's insurance status for any given point in time. The FRS Database includes the name and address of the insured; the vehicle's make, model, VIN number and plate number; and the insurance history of the vehicle. (*Id.* at 61:8-15; 62:6-10).

20. The FRS created the Database in 2002. At that time, FRS sent law enforcement agencies information about the FRS Database and how to use it. (*Id.* at 62:22-63:13).

21. All insurance companies are required to report every New Mexico-issued policy to PASCO for inclusion in the FRS Database. (*Id.* at 59:10-18). PASCO matches the

5

information against the MVD records to update the insurance status for registered vehicles. (*Id.* at 59:1-17). The FRS Database is updated every time an insurer reports a change in a vehicle's insurance status. (*Id.* at 60:5-15).

22. The FRS Database has a set process for verifying insurance coverage. Forty-five days after the FRS Database registers the insurance status of a vehicle as unknown, the system will generate a notice to the vehicle owner requesting verification of insurance within thirty days. If no proof of insurance is received, the vehicle's registration is suspended. The process takes approximately ninety-five days. (*Id.* at 67:24-68:20).

23. Accordingly, if a vehicle's insurance expired on July 1, 2013, the vehicle's registration should have been automatically suspended if the insurance had not been updated within ninety-five days. (*Id.* at 68:21-69:8).

24. The FRS Database cannot be directly accessed by law enforcement, but there is a system whereby MVD relays information from the FRS Database to DPS. (*Id.* at 62:11-21). DPS manages its own database, the Registration Database. Each night, MVD sends the information to DPS. DPS is supposed to update the motor vehicle registration inquiry record. (*Id.* at 62:16-22). However, no evidence was presented as to how often, or even if, the DPS updates the Registration Database.

25. Defendant's Exhibit A is from the motor vehicle insurance record, which is separate from the FRS Database. It is the information generated when an owner first registers and titles a vehicle. (*Id.* at 70:14-71:6-11). This information is entered into the motor vehicle record and "is strictly the information entered manually at the time of titling and registering the vehicle." (*Id.* at 73:21-25). The information in this report is static – it never changes unless the vehicle is titled with a new owner. (*Id.* 74:2-13).

26. The information on Defendant's Exhibit A is the source of the information in Government's Exhibit 1. (*Id.* at 73:9-14). Government's Exhibit 1 is the information returned to Officer Richard when he queried the insurance status of the Cadillac Defendant Beltran-Vivanco was driving. (*Id.* at 8:25-9:10).

27. Defendant's Exhibit B is a motor vehicle registration inquiry record. This record is the current registration, insurance status, and other information regarding a vehicle. The MVD regularly updates this information. (*Id.* at 75:12-18). MVD expects officers to rely on this report when in the field. (*Id.* at 78:10-23).

28. Defendant's Exhibit C is a report generated about the Cadillac from the FRS Database. The document lists the vehicle information, name and address of the owner, and the insurance history. (*Id.* at 83:1-19).

29. According to the FRS Database, the Cadillac had active insurance on December 9, 2013. (Def. Ex. C). In fact, there had never been a lapse in insurance for the Cadillac. (*Id.* at 84:1-85:6). GEICO had been the insurer for the vehicle since 10-26-12. (*Id.* at 86:6-17). None of this information is included in Government's Exhibit 1. (*Compare* Gov. Ex. 1 to Def. Ex. C).

30. The report accessed by Officer Richard on December 9, 2013 did not reflect the most current information from the FRS Database. (*Id.* at 73:12-74:4).

## CONCLUSIONS OF LAW

Defendant Beltran-Vivanco argues that the stop of his vehicle violated his Fourth Amendment rights. Accordingly, he moves to suppress all physical evidence and statements obtained as a result of the December 9, 2013 seizure. (Doc. 43).

The Fourth Amendment to the United States Constitution protects "[t]he right of people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. **"A traffic stop is a "seizure" within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"** *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The constitutionality of traffic stops is analyzed under the two-step process developed for investigative detentions as set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). The first inquiry is whether the stop was justified at its inception by "either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) (citing *United States v. Ozbirn*, 189 F.3d 1194, 1197-98 (10th Cir. 1999)) (internal quotation marks omitted). The second inquiry is whether the officer's actions were reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Sanchez*, 519 F.3d 1208.

The Court addresses each of these inquiries in turn.

## I.      The Initial Traffic Stop

The Tenth Circuit instructs that "a traffic stop will be held reasonable when, under the totality of the circumstances, the officer bears a 'reasonable suspicion' that criminal activity 'may be afoot.'" *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205-06 (2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). To satisfy this standard, an officer must have "a 'particularized and objective' basis for thinking the detained individual is involved in criminal activity." *Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)). Further, an officer

must have "some level of objective justification," *INS v. Delgado*, 466 U.S. 210, 217 (1984), but "need not rule out the possibility of innocent conduct as long as the totality of circumstances suffices to form a particularized and objective basis for a traffic stop." *Cortez-Galaviz*, 495 F.3d at 1206 (quoting *United States v. Yercher,* 358 F.3d 1257, 1261 (10th Cir.2004)). Accordingly, reasonable suspicion may be supported by "a showing considerably less than preponderance of the evidence." *Id.* (quoting *Yercher*, 358 F.3d at 1263).

Here, with one major exception, the facts giving rise to reasonable suspicion are relatively straightforward. Around mid-day on December 9, 2013, Officer Richard observed a white Cadillac on Interstate 10. Driving under the speed limit in the passing lane, the vehicle caught Officer Richard's attention. (*See* Doc. 58 at 49:19-50:5). Officer Richard decided to use his mobile dispatch unit to access the Registration Database to confirm the car had valid registration and insurance. Under New Mexico law, a vehicle – not the driver – must be insured or the owner must have evidence of financial responsibility. *See* N.M.S.A. § 66-5-205. The Registration Database report showed that the Cadillac's insurance had expired on July 1, 2013. Based solely on the information he gained from that report, Officer Richard initiated a traffic stop.[2]

Had the Registration Database been reliable, this would be the end of the story. The Tenth Circuit "has regularly upheld traffic stops based on information that the defendant's vehicle registration failed to appear in a law enforcement database." *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1235 (2013). But, what happens when the defendant shows that the database relied on the wrong data – or "garbage" as the Tenth Circuit calls it? *See id.* at 1234. And, then shows that this bad data produced bad results – "[g]arbage in, garbage out[?]" *See id.*

---

[2] The Court concludes that the only basis for reasonable suspicion was the information Officer Richard gained through his use of the Registration Database. The Government does not contend, nor does the Court believe, that driving below the speed limit in the passing lane is a basis for reasonable suspicion.

This is the scenario before the Court. Officer Richard relied on a database that suffered from a fatal flaw: it utilized static insurance information to make the dynamic assessment of whether a vehicle is currently insured. For this reason, on December 9, 2013, the Registration Database falsely identified the Cadillac as uninsured. So, given the flawed database, did Officer Richard have a particularized and objective basis for the traffic stop? Two cases from the Tenth Circuit guide the Court's analysis.

In *United States v. Cortez-Galaviz*, the Tenth Circuit flagged the possibility that a demonstrably unreliable database may "form a persuasive basis for a suppression motion." 495 F.3d at 1209. Like this case, *Cortez-Galaviz* involved the validity of an initial traffic stop. *Id.* at 1205. On October 20, 2005, an officer was on a stakeout of a suspected drug dealing operation when he observed the defendant leaving the scene. *Id.* at 1205. "Deciding to follow the defendant's vehicle, [the officer] typed its license plate information into his squad car computer to check its registration and insurance status." *Id.* The database showed the following message:

> INSURED/Not Found: AS
> OF 9/30/2005 Recommend request
> Proof of insurance.

*Id.* at 1205 (formatting slightly altered). Based on this message, the officer initiated a stop, and subsequently found drugs in the vehicle. *Id.*

Because the result of the insurance check was "Not Found," the Tenth Circuit held that the officer had "particularized and objective information before him suggestive of a traffic violation." *Id.* at 1206. In coming to this conclusion, the Tenth Circuit addressed two arguments related to the current case. First, the defendant argued that the database was unreliable. Given the limited evidence in the record, the Tenth Circuit rejected this argument. *Id.* at 1208-09. However, the Court observed that "a demonstration that [the insurance database] was unreliable might well

10

form a persuasive basis for a suppression motion." *Id*. at 1209. Second, the Court also rejected

the defendant's argument that the 20-day gap between the alert and the officer's inquiry rendered

the information too stale to support a traffic stop. *Id.* at 1209. Yet, the circuit court qualified this

finding, stating: "Of course, outer boundaries exist for the usefulness of data, even for offenses

typically protracted and ongoing in nature, *see, e.g., United States v. Laughrin*, 438 F.2d 1245,

1248 (10th Cir. 2006) (22-week-old information about a defendant driving on a suspended

license was too dated without additional indicia of reliability)." *Id.*

About eight years later, the issues left unresolved in *Cortez-Galaviz* came to a head. In

*United States v. Esquivel-Rios*, the Tenth Circuit confronted for the first time the issue of what to

do when a "computer suggests you've broken the law only because of bad data[.]" 725 F.3d 1231

(2013). Like the current case, *Esquivel-Rios* began with an officer – without any articulable basis

for suspicion – performing a record check in a law enforcement database on a vehicle's

temporary tags. *Id.* at 1234. A dispatcher informed the officer that the tags came back as "no

return," which was not uncommon: "Colorado temp tags usually don't return." The trooper then

stopped the vehicle. *Id.* After a brief discussion, the trooper obtained permission to search the

vehicle and found methamphetamine. *Id.* at 1234-35.

Arguing the stop violated his Fourth Amendment rights, the defendant moved to suppress

the evidence. The trial court found there was reasonable suspicion to support the stop and denied

defendant's motion. Because the district court did not review the adequacy of the database or

consider the dispatcher's comment about temp tags not usually returning, the Tenth Circuit

reversed and remanded for further findings. *Id.* at 1238-39. While the circuit court acknowledged

that "[t]his court and others have regularly upheld traffic stops based on information that the

defendant's vehicle's registration failed to appear in a law enforcement database," a negative

11

return from a database does not automatically equal reasonable suspicion. *Id.* at 1235. When circumstances show a reason to worry about the database's reliability, the Tenth Circuit instructed a reviewing court to give a full vetting of the database. *See id.* at 1235 (emphasis added).

With these cases in mind, the Court turns to the case at hand.

At the outset, the Court notes that the burden is on the Defendant to make "a demonstration based on evidence that the database in question is unreliable." *Id.* (internal quotation and quotation marks omitted). To satisfy this burden, the Defendant presented the testimony of Walter Martinez. Walter Martinez leads the Financial Responsibility Section (FRS) of the Motor Vehicle Department (MVD). He, along with a contractor, maintains the FRS Database, which is a comprehensive list of vehicle insurance policies in effect in the State of New Mexico.

The Government argues that because Mr. Martinez is not directly familiar with the Registration Database, the Defendant has not met his burden. The Court disagrees. Mr. Martinez's testimony is compelling. Mr. Martinez is in charge of the system whereby the insurance records are maintained. He is intimately familiar with the details and operations of the system. The Registration Database relies on information collected by his unit. From the exhibits adduced at the evidentiary hearing, he was able to confidently dissect the workings of the Registration Database and testify about its origins. Thus, the Court finds that Mr. Martinez's testimony on the reliability of the Registration Database is trustworthy.

Mr. Martinez's testimony distinguishes this case from *Cortez-Galaviz* and *Esquivel-Rios.* In both of those cases, the Tenth Circuit was provided with little information concerning the reliability of the database in question. That is not the case here. Mr. Martinez testified in detail

about the database. From his testimony, the Court understood the facts as follows. The Registration Database pulls its information from the Motor Vehicle Database, which is a static record of a vehicle's insurance coverage. (*See* Gov. Ex. 1; Def. Ex. A). The Motor Vehicle Database includes information from when an owner first titled and registered a vehicle; it is never updated unless a new owner titles and registers the vehicle. Unlike the FRS Database, the Registration Database was not designed to provide a dynamic record of a vehicle's current insurance status. Thus, according to Mr. Martinez, Officer Richard relied on a database that will *always* return inaccurate information about a vehicle's insurance status approximately six months after the vehicle has been titled and registered. In other words, Officer Richard relied on the wrong database.

How often is the Registration Database wrong? The Court cannot answer this question. Based on Officer Richard's testimony it is clear that the Registration Database has a history of providing inaccurate results. Yet, Officer Richard also testified that the Registration Database is right "most of the time." (Doc. 58 at 46:10-13). Whether this means 51% of the time or something more, the Court does not know. No matter the exact percentage, this testimony does confuse the issue. If the Registration Database only contained the insurance information at the time a vehicle was first titled and registered, it seems unlikely that the Registration Database would produce accurate results most of the time. Even if a broken clock is right twice a day, it is unlikely that it would be correct most of the time. Nevertheless, this evidence is anecdotal. The Court does not find it more compelling than Mr. Martinez's detailed testimony about the workings of the database.

The role Officer Richard plays in this database drama is unclear. In *Esquivel-Rios*, the dispatcher told the officer that the database in question usually returned invalid results. While the

Tenth Circuit found this comment important, it did not explicitly impose a knowledge requirement on the officer. Rather, it seems that the officer's knowledge about the reliability of the database is just another factor for a court to consider in its analysis.

The Defendant argues that Officer Richard should have known that the Registration Database produced an inaccurate result on this occasion. Pursuant to New Mexico law, the Cadillac's registration should have been suspended by December 9, 2013, if the vehicle's insurance expired on July 1, 2013. *See* N.M.S.A. § 66-5-206 ("Upon a showing by its records or other sufficient evidence that the required insurance or evidence of financial responsibility has not been provided or maintained for a motor vehicle, the department shall suspend its registration of the motor vehicle."). Since the Registration Database showed the Cadillac had valid registration, Defendant contends that Officer Richard should have at least questioned the database's result. The Court disagrees. The law does not state how long it takes after a vehicle's insurance lapses before the registration is suspended. Accordingly, Officer Richard cannot be expected to know that the Registration Database was inconsistent with the law.[3] Moreover, the inconsistency did not necessarily mean that the vehicle had insurance.

Indeed, there is no indication that Officer Richard knew that the Registration Database was fatally flawed. At most, Officer Richard was aware that the Registration Database was not completely accurate. He testified that he had previously stopped vehicles because of incorrect information from the Registration Database. (Doc. 58 at 12:5-20). While no one told him directly that the Registration Database was fatally flawed – which law enforcement would have no incentive to do – his own experience may have given him notice about the Registration Database's reliability. (*Id.* at 12:24-13:1).

---

[3] Mr. Martinez testified that a vehicle's registration is generally suspended 95 days after the FRS Database is notified that the vehicle lacks insurance.

The Government argues that Officer Richard committed a mistake of fact. A mistake of fact can provide a valid excuse in cases such as these: "An officer's objectively reasonable mistake of fact may support the reasonable suspicion or probable cause necessary to justify a traffic stop." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). However, the Court does not believe that the failure of the database should be attributed to a mistake of fact. The mistake of fact analysis centers on the officer's actions. Officer Richard did not make a mistake of fact. He queried the database and read the results correctly. When, as is the case here, a database is the culprit for the mistake, the error is with those who build and maintain the database and refuse to acknowledge its shortcomings.

In sum, the Court finds that the Defendant's challenge to the Registration Database is legitimate. Relying on static, dated information, the Registration Database is bound to be inaccurate most of the time. Or in the words of the Tenth Circuit, the Registration Database relies on garbage. These are the circumstances against which the Tenth Circuit warned in *Cortez-Galaviz* and *Esquivel-Rios.* As a result, the Court determines that because of the bad database, the traffic stop of the Defendant's vehicle violated the Fourth Amendment.

## II.     The Duration of the Stop

Second, if a traffic stop was justified at its inception, the court must determine whether "the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." *Winder*, 557 F.3d at 1134 (citations omitted). "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003).

As the Court determined that the initial traffic stop was not justified, the second step of this inquiry is moot. However, as this point might be relevant on appeal, the Court will address

the parties' arguments on this issue. A brief review of the facts and relevant law, indicate that the Officer's actions subsequent to the stop were reasonable.

Officer Richard initiated the traffic stop to investigate the insurance status of the Cadillac. Upon approaching the vehicle, he was presented with what turned out to be valid insurance. However, this did not necessitate an end to the stop. Under firmly established Tenth Circuit law, "[a] law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997). Moreover, the circuit has held that during the stop, an officer may ask routine questions about the driver's travel plans. *See United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

Based on the evidence obtained through these routine activities, Officer Richard was justified in continuing the stop. "An investigative detention may be expanded beyond its original purpose" on the basis of reasonable suspicion. *United States v. Villa-Chaparro*, 115 F.3d 797, 801-802 (10th Cir. 1997) (citing *United States v. Jones,* 44 F.3d 860, 872 (10th Cir. 1995)). From Officer Richard's initial questions, he was able to learn: (1) the Defendant was driving a vehicle that did not belong to either him or his passenger; (2) the Defendant did not have a valid driver's license; (3) that Defendant was on a very quick trip to Phoenix. Further, Officer Richard was able to observe the Defendant acting in what Officer Richard believed was a suspicious manner. All of these considerations gave more than sufficient justification for Officer Richard to continue the stop.

Therefore, the Court determines that, notwithstanding the legality of the initial stop, the investigative detention of the Defendant was reasonable.

### III.       The Exclusionary Rule Applies

Having found the traffic stop violated the Fourth Amendment, the question of a remedy remains. Generally, when a court finds that a defendant's Fourth Amendment rights were violated, the remedy in the context of a criminal prosecution is the exclusion of the unlawfully seized evidence from the government's case-in-chief. *See United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006) (citations omitted). However, the exclusionary rule is not automatic. *See Davis v. United States*, 131 S.Ct. 2419, 2423 (2011). "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Arizona v. Evans*, 514 U.S. 1, 12 (1995).

The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded. *See United States v. Torres-Castro,* 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies. *See id.*; *see also United States v. Corral-Corral*, 889 F.2d 927, 932 (10th Cir. 1990) (stating that it is the government's burden to demonstrate that the good-faith exception applies).

Here, the Defendant has established the requisite nexus between the constitutional violation and the evidence sought to be excluded. But for the illegal traffic stop, there is no indication that the officers would have found the contraband. (*See* Doc. 43 at 8). Accordingly, it is the Government's burden to demonstrate that the exclusionary rule does not apply. The Government does not mention the exclusionary rule in either its response to the motion to

suppress or in its proposed findings of fact and conclusions of law.[4] (*See* Docs. 49, 61) Similarly, the Government made no mention of the exclusionary rule or its exceptions at the evidentiary hearing. Simply stated, the Government avoids the issue entirely.[5]

Inexplicably. Given the facts of this case, there are at least a few strong arguments to be made that exclusion would not be an appropriate remedy. First, Officer Richard did not engage in any culpable conduct. *See Davis*, 131 S.Ct. 2429 ("In the twenty-seven years of practice under the good-faith exception, the Court ha[s] never applied the exclusionary rule to nonculpable, innocent police conduct.") In fact, Officer Richard performed good police work; not only did he follow standard procedures, but also he was able to recognize suspicious conduct and turn a routine traffic stop into a seizure of a significant amount of methamphetamine. Second, when Officer Richard stopped the Cadillac, he arguably relied on binding circuit court precedent authorizing stops based on database results. *See Esquivel-Rios*, 725 F.3d at 1235; *see also Davis*, 131 S.Ct. 2429 ("An officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances.") And, third, the Supreme Court has on multiple occasions applied the good-faith exception in cases involving unreliable information learned from a database. *See Evans*, 514 U.S. at 14 (1995) (finding that exclusion was improper when the police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees); *Herring v. United*

---

[4] The closest the Government comes to meeting its burden as to the good-faith exception is its argument that Officer Richard committed a "good faith mistake of fact." (*See* Gov. Proposed Findings of Facts and Conclusions of Law, Doc. 61 at 6-7). Based on the relevant law concerning mistakes of fact and the context of this claim, it is clear that the Government makes this argument to demonstrate the absence of a constitutional violation. This is a separate inquiry from whether the good-faith exception applies in terms of a remedy. *See Evans*, 514 U.S. at 12. Allowing this claim concerning a mistake of fact to satisfy the Government's burden as to the good-faith exception is a greater stretch than this Court is willing to make.

[5] This is surprising. The Tenth Circuit's decision in *Esquivel-Rios* – a decision discussed in detail in the Government's brief – explicitly states that the exclusionary rule is an issue the district court must consider. *See Esquivel-Rios*, 725 F.3d at 1239 ("Even if the district court on remand doesn't find a Fourth Amendment violation, we believe it would still be prudent for the court to consider the remedial question.") Further, the question of remedy is part and parcel of any motion to suppress.

*States*, 555 U.S. 135, 144 (2009) (finding that exclusion was improper when the police reasonably relied on a flawed warrant database they maintained).

But the Government fails to make any of these arguments. It has, therefore, defaulted on its burden of demonstrating whether any exception to the exclusionary rule applies in the current case. On this basis alone, the Court will suppress the illegally seized evidence. *See United States v. Nicholson*, 721 F.3d 1236, 1246 (10th Cir. 2013) (refusing to consider whether the good-faith exception applied in a situation where the government failed to argue the issue before the district court).

## IV.    Conclusion

In coming to this conclusion, the Court recognizes that the law on this subject is novel. The line between a reliable database and an unreliable one is murky at best. The Court also understands that there are many more questions that could be asked, and that the story of the Registration Database may be incomplete. Yet, the Court must make its decision based on the testimony presented and the facts in the record. Here, the Defendant provided significant evidence that the Registration Database was fatally flawed. The Government did not provide any concrete evidence to the contrary, nor address the issue of remedy.

**THEREFORE**

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 43) is **GRANTED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**